HENRY J. JOHNSON, Ordinary of Floyd County, plaintiff in error, *vs.* WILLIAM McCULLOUGH *et al.*, guardians, *et al.*, defendants in error.

1. Where, in an action against principal and sureties on a guardian's bond, the breach alleged is, not failure to collect assets, but failure to account for and pay over assets which came to hand, the inventory and returns made by the principal, as administrator upon the ward's father's estate, prior to his appointment as guardian, are not competent evidence for the plaintiff. As admissions, they cannot be used to affect the sureties, not being offered for the purpose of impeaching the guardian as a witness.
2. As matter of correct practice, a motion to strike a part or all of a special plea, is not in order after the evidence is all in. Nor is it then in order to rule out evidence which, as the plea stood, was legally admitted.

3. A guardian's returns are only *prima facie* evidence for or against him, and may be explained by parol. 45 *Ga.*, 520.

4. Where the evidence shows that certain notes held by a guardian were paid before the war, in order to take credit for the amount thereof as Confederate money invested in Confederate bonds, he must make it appear how the fund became changed into Confederate money. 52 *Ga.*, 600.

5. If all the funds invested were Confederate funds, an order to invest, though broad enough to cover other kinds also, would be no aid to the guardian in accounting for other kinds not legally converted into that kind.

6. That a guardian might be justifiable in collecting a note belonging to his ward in Confederade money, would not authorize him to sell it for such money to a third person, without an order of sale from the ordinary. Code, § 1828.

7. Which of the following propositions will, on the facts, be found to be the true law of this case, is, for the present, left an open question, inasmuch as the case was prepared for trial and, in the main, tried below on the special plea which treated the notes as the true fund to be accounted for, and as a new trial should be granted, whether that theory be correct or not:

. (*a*.) The first proposition may be stated thus: Where, before the war, an administrator became guardian of one of his intestate's children, and, in settlement with himself in the character of administrator on the one side, and guardian on the other, he used promissory notes belonging to the estate, treating them as money, and, in his first return as guardian, charging himself, not with notes as such, but with an equal mount of cash, this was equivalent to a conversion of the notes into money at that time, and what became of them afterwards is none of the ward's concern, unless he should elect to pursue them as a trust fund. The guardian cannot oblige him to accept the notes or their proceeds, in lieu of actual money, in anaccounting between them. 41 *Ga.*, 579; 57 *Ib.*, 226.

(*b*.) The alternative proposition may be stated in the same terms down to the word *cash*, and then proceed as follows: This only made the guardian a guarantor of the then solvency, and the continued solvency, of the notes until they should be collected. If, in good faith, he collected them during the war in Confederate money, at a time when prudent creditors received such money in payment of like debts due them, the Confederate money then became the trust fund, and the legal investment thereof in Confederate bonds, under an order of the judge of the superior court, and the production of the bonds now, will be a sufficient accounting for the amount so invested.

Guardian and ward. Administrators and executors. Evidence. Pleadings. Practice in the Superior Court. Con-

federate money. Before Judge Underwood. Floyd Superior Court. January Adjourned Term, 1877.

This was debt on a guardian's bond. The declaration alleged that the defendants, Wm. McCullough and Wm. Bailey, were, on April 2, 1860, appointed joint guardians of Willis L. Lowrey, and on that day qualified and gave bond as such, in the sum of $20,000.00, with the other defendants as sureties. That McCullough only assumed the trust and acted. That on the 1st of October, 1860, McCullough, as such guardian, received from the estate of W. B. Lowrey, the father of W. L., $10,736.57, as the distributive share of W. L., which sum he had neglected to invest and secure for the use of his ward, but had converted to his own use, etc. That the ward had, in 1874, arrived at age and demanded a settlement, which was refused, etc.

The defendant, McCullough, pleaded the general issue, and further, that "all the property he received for his said ward was in promissory notes on divers persons, and not in money, and that he received payment of the same in Confederate money, during the war," and invested said money, by order of the judge of the superior court, in Confederate bonds, which he now has on hand, etc.

This plea was subsequently amended, by stating that "as far as he can now remember," the following are the amounts and names of makers of the notes received by him as stated in his first plea, (naming them.)

"That all of said notes were dated as far back as 1857, 1858 and 1859.

"That said notes were all paid during the years 1862 and 1863, in Confederate money," but the exact dates could not be remembered.

Sets forth the order of court for investment in Confederate bonds, dated March 11, 1863.

That he invested in such bonds $10,500.00, as follows: Bought of one Duncan, in Atlanta, on April 18, 1863, three $1,000.00 bonds, and one $500.00 bond; of N. J. Bayard,

on May 8, 1863, one $1,000.00 bond; on March 19, 1864, of J. F. White, six $1,000.00 bonds; also, from John H. Duncan, "one other bond or certificate" of $1,000.00.

The plaintiff introduced the following evidence:

The guardian's bond sued on.

The final return of the defendant, McCullough, as administrator of the estate of W. B. Lowrey, in which he credits himself as such administrator, with $10,736.57, paid to himself as guardian of W. L. Lowrey, on October 1, 1860. Return made that day:

### RETURN NO. 1.

The first annual return of Wm. McCullough, guardian of Willis L. Lowrey:

October 1, 1860.  To amount cash received from Wm. McCullough, administrator of Willis B. Lowrey, deceased... ........$10,736 57

### RETURN NO. 2.

Wm. McCullough, guardian of Willis L. Lowrey, minor, in account current:

October 1, 1860.  Amount received of Wm. McCullough, administrator Willis B. Lowrey, deceased .........................$10,736 57

Interest 3 months.... ......................... ...........   187 88

                                                       $10,924 45

### CR.

December 2.   By Bailey's account, voucher 1.....$66 81
              By 5 per cent. on amount paid.  ...    3 34
December 31. By 10 per cent on interest realized.. 18 78—$   88 93

   Balance........  ............................ ....$10,835 52

Return made March 1, 1861.

### RETURN NO. 3.

Wm. McCullough, guardian, etc., as preceding:

January 1, 1862. To balance on hand.....................$10,835 52
                 To interest one year............. .......   758 48

                                                       $11,594 00

Johnson, ordinary, *vs.* McCullough *et al.*, guard'ns, *et al.*

### CR.

By various amounts—in the aggregate ................................$    204 83
   including 10 per cent. on $758.48, interest—$75.84.

   Balance ...............................................................$11,389 17

Date, February 10, 1862.

### RETURN NO. 4.

December 31, 1862.   To balance on hand.................$11,389 17

### CR.

Various small items, aggregating..............................$170 95

Dated January 13, 1863.

It was admitted that W. L. Lowrey arrived at age a short time before the suit was brought.

The plaintiff closed.

The defendants introduced in evidence the following returns of McCullough as guardian of W. L. Lowrey:

### RETURN NO. 4($a$).

| | | |
|---|---|---:|
| Jan'y   1, 1863. | To balance on hand...................... | $ 6,718 22 |
| April 18, 1863. | 3 bonds, $1,000.00, purchased of Duncan, | |
| | Atlanta........................................................... | 3,000 00 |
| April 18, 1863. | One bond of $500.00 ........................ | 500 00 |
| May,   8, 1863. | One bond, $1,000.00, of Bayard ........: | 1,000 00 |
| | | $11,218 22 |

### CR.

Various vouchers for expenses, aggregating. ...............$    282 76

   Balance on hand January 1, 1864.....................$10,935 46

Dated January 27, 1864.

### RETURN NO. 5, (DATED JULY 1, 1867.)

To balance on hand from last return.....................$10,935 46
Interest 1¼ years................................................    191 35

### CR.

March 19, 1864. By five 8 per cent. Confederate bonds, of
   $1,000.00 each, bought of J. F. White, at par.............$5,000 00
Other items of expense, aggregating $87 15...................... 87 15

   Balance on hand.................................................$ 6,039 66

RETURN NO 6, DATED JUNE 21, 1871.

To balance on hand from return No. 5.........................$6,039 66

CR.

By amount Confederate · bonds, omitted in last
  return.................................................$4,500 00
J. J. McCullough's receipt, voucher 1............. 1,500 00
Various other small items........ ................    53 38—$6,053 38

   Balance due guardian ............. .............. ..........:.$13 72

RETURN NO. 7, DATED MARCH 7, 1875.

March 7, 1875.  By certificate of deposit, being the proceeds of cou-
  pons of bonds, but not put on record, dated March 16, 1864, voucher
  No. 1...............................................................$1,000 00
By amount paid ordinary, voucher 2.....................    3 02
By amount paid ordinary, voucher 3 .....................    2 04
                                                        ‾‾‾‾‾‾‾‾
                                                        $1,005 06

The testimony of Jesse Lamberth showed that McCul-
lough was excusable for making no return in the year 1864,
and that the currency of the country for 1862, 1863 and
1864, was Confederate money.

Wm. Bailey, a defendant, testified: The heirs of W. B.
Lowrey were his two sons, W. L. and Thos. M., and his
widow, (whom I afterwards married,) each having one-third
interest in the estate.   Lowrey died on December 24, 1856.
The estate consisted principally of negroes and notes at
Lowrey's death.   At time of settlement with the adminis-
trator, it consisted principally of notes taken by Lowrey in
his lifetime.   I represented two of the heirs—Thos. M.
Lowrey, as guardian, and my wife as husband.   In this set-
tlement I refused to take some *fi. fas.* on R. H. Moore and
Tom Zuber, because they were slow pay.   I received in
lieu of these, papers belonging to McCullough individually.

I sold McCullough a family of negroes in the winter of
1863, for cash.   He paid, in part, a thousand dollar Con-
federate bond, which, afterwards, I let him have back.
Confederate money was the only currency during the war,
and prudent men received it, etc.

W. B. Lowrey sold his farm, and most of his other property, during his lifetime.

The Moore *fi. fas.* were for about $2,000.00.

The first sale by the administrator, was in the early part of 1857, and the second in the fall of that year.

I received no money in the final settlement of the estate, but the following notes: One on Sloan & Cothran, for about $13,000.00, given to Lowrey in his lifetime; one note and mortgage on Medcalf for about $650.00; and other individual notes of McCulough, amounting, in all, to about $2,000.00.

The defendants introduced the petition of McCullough and Bailey, as guardians of Willis L. and Thomas M. Lowery, to the chancellor, for authority to invest in Confederate bonds, upon which was passed the following order:

"AT CHAMBERS, March 11, 1863.

"Upon hearing the foregoing petition, it is ordered that the prayer of petitioner be granted, and that said guardians be authorized to invest any money now on hand, or that may come to their hands hereafter, in bonds of the Confederate States, or in lands, at their discretion, until further ordered.        LUCIUS FEATHERSTON, J. S. C., T. C."

The defendant, Wm. McCullough, testified as follows: The share of W. L. Lowrey in the estate of his father, W. B. Lowrey, which I received as guardian, as shown in my returns, was entirely in notes belonging to said estate. The estate consisted mostly of notes, but little money, say $500.00. Lowrey had sold his lands and most of his negroes before his death. I was administrator of the estate. I collected up some of the notes of the estate, and loaned out the money. I kept the money loaned out. Collected but little in 1860 and 1861. These notes, which I received as guardian, were paid in 1862 and 1863, and perhaps up to February, 1864, all in Confederate money. There was no other currency, and prudent men were receiving it. I understood there was a law compelling men to take it, or to put a man into the service for refusing to take it. I took it in good faith.

In the early part of 1863, having some of this money collected, and expecting to get more soon, I and Mr. William Bailey, who was guardian of the other boy, came to town to consult Judge Harvey about what we could do with it, and we got him to make the application to the judge of the superior court and obtain the order for investment in Confederate bonds, shown in evidence. Under that order I bought, in March, 1863, three one thousand dollar bonds and one five hundred dollar bond, from one Duncan, of Atlanta, and one $1,000 bond from N. J. Bayard, of Rome. About March 16, 1864, I bought six other bonds from J. F. White. The bonds now shown me are the same that I bought. All of these bonds had, when I bought them, some accrued interest, and my remembrance is, that I paid that much besides the face of the bonds. One of these bonds bought from White was omitted in making my return as guardian.

The thousand dollar 4 per cent. certificate now shown me, I bought at the time of its date, with the overdue coupons on the bonds.

The *fi. fas.* against R. H. Moore, which I offered to Mr. Bailey in settlement of the Lowrey estate, as he has testified became the property of the estate in this way : T. W. Alexander controlled a number of *fi. fas.* against Moore, and Moore applied to me to loan him money to take them up. I paid the money on them, and had them assigned to me as administrator. The amount I paid was $2,161.00, of which $2,000.00 was money of the estate, the balance my own. This was on March 5, 1857. There was a large amount of interest due on these *fi. fas.*, and I had Moore to give me, individually, his note for the interest on this interest. I did not think the estate entitled to that, and it was paid to me by Moore during the war. When Bailey declined to take these claims against Moore, and one against Zuber, for about $600 00, in settlement of the estate, I put other individual claims of my own in their place, and then took them as my own.

The $1,000.00 note on J. H. Thomas, mentioned in my plea, become the property of the estate in this way : I sold a negro woman of my own to Thomas for $925.00, and took his note, with Wm. Thomas as indorser. I then put this note into the estate in the place of some notes the estate held against my brother and myself.

In regard to the E. P. Ware note ; in 1863, R. H. Moore applied to me to let him have that note to use in a land trade, with the promise to return it if he did not use it. I let him have it, and soon after he paid me the money. He paid me $1,600.00, about $1,000.00 of which was the amount of the Ware note, and the balance was for interest on the *fi. fas.* I held against him, and, may be, a small store account.

I became administrator in the latter part of 1856. Mrs. Lowrey, the widow, was administratrix with me. I sold the negroes and other property soon after my appointment.

The note of H. L. and J. H. Johnson, mentioned in my plea, was for money of the estate loaned to H. L. Johnson, (J. H. was surety), and was payable to me as administrator and to Mrs. Lowrey as administratrix. Don't remember what time it was given. I had a book containing an account of all my transactions as administrator and guardian, which was lost during the war. This note was paid in 1862 or 1863, date not remembered. H. L. Johnson lived in Charleston, S. C., and died during the war.

The note of Jacob Wise was given to me as administrator in renewal of one he had given to Lowrey. It was paid during the war. Wise is dead.

The note of E. P. Ware was for a negro bought at the sale of Lowrey's estate. That note I traded to R. H. Moore during the war, as I have already stated. Ware did not give me any mortgage to secure that or any note. I had no other note against him, either of my own or as administrator, unless for some small store account. The note was payable to me as administrator of Lowrey. I did not take any note in renewal of this. Ware died during the war. R. H. Moore, as I understood when I let him have

this note, had bought land from Ware and was about selling the same land to Hiram Hammond and Mrs. Thomas, and he wanted the note to use in paying Ware for the land.

The note of Joseph Watters was for a family of negroes bought at the Lowrey sale. Watters died during the war. Since I come to reflect about it, that note was paid before the war.

The note of J. S. Morris was also for a negro bought at the Lowrey sale, and that note, I have also ascertained, was paid before the war.

The note of J. H. and W. Thomas, I also admit was paid before the war. J. H. lives in Texas; Wm. is dead.

The note of Wm. H. Thomas was for over $600, instead of $400, as stated in my plea. The way that note and the mortgage to secure it came to be payable to me individually was this: Thomas wanted to borrow money of the estate to pay for some land, but Mrs. Lowrey was not willing to let him have it on the mortgage he offered. So I indorsed his note to the estate for the money, and then loaned it to Thomas, and took his note and mortgage to me individually for it. This note was paid during the war.

I loaned no money at over seven per cent. My policy was to renew notes from time to time, and add in the interest. All the other notes mentioned in my plea were for debts due the estate of Lowrey. The note of Palmer & Powers, for $350, was for a lot of land of the estate in Burke county. I am not certain whether that was paid before the war or not. All the foregoing are the notes mentioned in my plea. During the war I bought seven negroes from Wm. Bailey, for which I paid him $10,000 Confederate money. I was, during and before the war, administrator of several other estates, and guardian of some other minors. The vouchers in my return made in 1871, showing $1,500 paid to J. J. McCullough in 1864–'65 are for Confederate money. The reason of my delay to make returns after the war was, that I could not get vouchers from McCullough in Jackson county in proper form. My

ward had been boarding with him, and had vouchers which the ordinary said were too general, and had one for a $1,000 certificate, which I wanted changed to $500, as that was all that McCullough said he could get for it, and it was my individual funds. I lost the $500.

The defendant introduced in evidence the following Confederate bonds:

Eight bonds of $1,000 each, six of them dated March 2, 1863, and due July 1, 1868; one dated May 1, 1861, and due September 1, 1871; and one dated April 4, 1862, and due July 1, 1872.

Five bonds of $500 each, two of them dated May 1, 1862, and due May 1, 1872; one dated May 1, 1861, and due September 1, 1871; one dated March 2, 1863; and one dated February 21, 1862.

Also, one 4 per cent. certificate of deposit under the new issue act, for $1,000, dated March 16, 1864.

Barbour's table was introduced.

Defendants closed.

The plaintiff, in rebuttal, introduced the testimony of R. H. Moore, as follows: that he formerly lived in Floyd county, and did, in 1860 or 1861, he thinks, borrow $1,500 to $2,000 from McCullough, at twelve per cent. interest, and gave note to McCullough individually. The money was mostly that of the Lowrey estate. He has never paid it.

McCullough loaned him money, and also made advances and took control of *fi. fas.* against him.

Thos. E. Zuber testified, that he had lived in Floyd county before the war. He owed James Watters about $600, and in 1857 or 1858 Watters transferred the claim to Wm. McCullough, in part payment for a family of negroes he had bought from the Lowrey estate. The debt is yet unpaid.

James S. Morris testified, that the debt he owed McCullough for the negro bought at the Lowrey sale was paid before the war. He paid McCullough no debt of any kind during the war.

J. H. Thomas testified, that he bought a negro woman

from McCullough in early part of 1856 for about $1,000. She was not the property of the Lowrey estate, and the note was to McCullough individually. He paid McCullough for the woman in the same year, or certainly before he moved to Texas, which was in the fall of 1858. He has resided in Texas ever since, but has been in correspondence with his relatives in Floyd county, Ga., in neighborhood of McCullough, and during all that time has never heard or had any intimation that McCullough claimed anything due from him, or to have lost anything by him.

The plaintiff also introduced a mortgage deed, made by E. P. Ware to Wm. McCullough, dated September 19, 1860, (recorded), conveying certain lands in Floyd county to McCullough, to secure a certain promissory note, of the same date, made by Ware, and payable to "Wm. McCullough or bearer," for the sum of $1,458.16, due December 15, 1861, with interest and expenses of collecting, etc.

Plaintiff closed in rebuttal.

The defendant, McCullough, again introduced, testified: I have no recollection of the mortgage of E. P. Ware to myself, introduced by the plaintiff, but I know it was not given to secure the note which he owed me, as administrator, for the negro he bought at the Lowrey sale.

In 1860, the year that mortgage seems to have been given, Ware sold his farm in this county, and bought a place in Gordon, and I think the purchaser failed to pay before he needed the money to pay for the place in Gordon; and I think I probably loaned him money a short time for that purpose, and this mortgage was given to secure that loan.

I am not certain that I loaned Ware money for the purpose just stated. Do not remember what the mortgage was given for, nor its being given at all. I know it was not given for the negro debt. That debt was for about $1,000, while this mortgage is for over $14,000. I did not renew the note from time to time, adding in the interest; nor did I add in the accounts that Ware owed me. The note I let R. H. Moore have was the same that Ware owed

me, as administrator, for the negro. Ware never owed me any other debt, either as administrator or individually, unless it was a loan for a short time, as stated before, or for a small store account.

The defendant again closed.

The plaintiff then introduced Robt. Ware, who testified: I am a son of E. P. Ware, and was administrator of his estate. My father, before the war, had sold some land to R. H. Moore and had his note for the purchase money. Moore had, during the war, sold the same land to Hiram Hammond and Mrs. Thomas. After the war, and sometime in 1866, I, as administrator of my father's estate, was about to proceed to enforce the vendor's lien for the purchase money against this land, when Hammond and Mrs. Thomas brought up, as a set off against Moore's note for the purchase money, this note of my father's, given to McCullough, and specified in the mortgage of my father to McCullough, already in evidence. We referred the matter to arbitrators, and as a result of the arbitration, I took up the note as a set off against the Moore note. I have searched for the note, but cannot find it. The arbitration is on record in this court.

The jury returned a verdict for the defendants.

A new trial was moved for by the plaintiff, on the following, among other, grounds :

1. Because the court refused to allow the plaintiff to put in evidence the inventory and appraisement of the estate of W. B. Lowrey, as returned by the defendant, McCullough, as administrator thereof, showing cash on hand $581.35, a certificate of deposit in bank for $3,000, a note on Sloan, Cothran & Hawkins, for $13,000, a large number of small notes, (but none on Jacob Wise), negroes and other property, dated February 5, 1857.

2. Because the court refused to allow the plaintiff to put in evidence the return of the sale of the negroes of said estate by McCullough, as administrator, showing that the sale was made on January 5, 1858, on a credit of twelve months, with interest from date, and that Joseph Watters bought a

woman and three children at $1,535; Jas. Morris, a girl, at $650; and E. P. Ware, a man, at $950.

3. Because at the close of the evidence the plaintiff moved to strike from the defendant's plea all that part setting up the receipt by the guardian of promissory notes in settlement of his ward's share of the estate, the collection of said notes in Confederate money, the investment of such money in Confederate bonds, and its consequent loss, on the grounds that such facts constituted no defense; also, to rule out all the evidence which had been adduced in support of said plea, (permission having been granted by the court in the beginning of the trial to make such motion at this stage of the trial.) Which motion the court overruled, holding the plea sufficient.

4. Because the court charged, at request of defendants, as follows:

"If McCullough received $10,736.82, or any other sum, as guardian of his ward, in notes, and afterwards collected the same in Confederate money, in good faith, at a time when prudent men were taking the money under similar circumstances, and invested the same in Confederate bonds, under an order of the judge of the superior court, he would not be responsible for the same though the bonds were lost by the results of the war."

5. Because the court charged as follows: "In this case, if you find from the evidence that the guardian, Wm. McCullough, received from himself, as administrator of W. B. Lowrey, notes and assets to the amount of $10,736.82, as stated in his first return as guardian, then he is liable for that amount in the same manner as he would be liable if he had received the same amount in money—no less liability, and no greater liability; and he is responsible for the amount so received, whether the notes were solvent or insolvent, collected or not collected.

"But if such notes did not prove insolvent, but were afterwards and during the war collected by the guardian in Confederate money, at a time when prudent men were

receiving such money under like circumstances, and the money so collected was, under an order of the judge of the superior court, invested by the guardian in Confederate bonds, and thus lost by the results of the war, the guardian would be protected, and not liable for such loss."

The latter clause of this charge being assigned as error.

6. Because the court charged: "If the moneys or assets in the hands of the guardian, became converted into Confederate money, and the facts and circumstances as proved to you satisfy your minds that the assets became so converted, the guardian, acting in good faith, receiving such currency under such circumstances as prudent persons usually did, in good faith and free from fraudulent act or intent, and the moneys so received have been invested in Confederate securities, by order of the judge of the superior court, the guardian ought to be protected to the extent of such investment thus made in good faith, if it is shown by the proof in the case to have been so made."

7. Because the court charged: "If it appears from the evidence that the guardian, acting in good faith, received Confederate funds in payment of debts due to him as guardian, at a time and under like circumstances when prudent men were receiving the same, and the funds were invested in Confederate bonds, in pursuance of an order of the judge of the superior court, the guardian acting in good faith in all the transactions, free from fraud in act or intent, he will be protected, and will not be liable for such funds so invested."

The same error alleged in the sixth ground is complained of here, and farther, that the court here assumes that the guardian had received payment in Confederate money of debts due to him "*as guardian*," which the proof did not justify.

8. Because the court charged: "You will read, examine and consider the returns in the light of the evidence, regarding the returns as *prima facie* proof, and the other

evidence explanatory thereof, and thus find the truth, right, equity and justice of the case."

9. Because the court charged : " If in any or all of the transactions of the guardian, as they may appear to you in the proof, the guardian acted in bad faith or fraudulently, in act or intent, in converting the funds in his hands as guardian, into Confederate money and in bonds, then he is not entitled to be protected, but is liable."

It is complained that in this charge, and in the charges set forth in the fourth, fifth and sixth grounds of the motion, ·the court assumed that *all* the assets of the ward's estate had been converted into Confederate money and invested in bonds; and the court did not anywhere charge upon the hypothesis that the proof failed to show that any part of the assets had been so converted; although it was proven, and admitted by the guardian on the stand, that a large amount of the *notes* claimed by the guardian, in his plea, to have been received as his ward's estate, were paid before the war, and no effort was made to trace their proceeds into Confederate money.

10. Because the court charged, at request of the defendants : " The plaintiff seeks, in this suit, to charge the defendant, as guardian, and the jury can only investigate his actings and doings as guardian, and cannot, in this suit, investigate his conduct as administrator of Willis B. Lowrey."

11. Because the court refused to charge the following request of the plaintiff : " It is claimed by the defendant, McCullough, that one of the notes which he received in settlement of his ward's share was upon E. P. Ware, which note he sold to R. H. Moore for Confederate money. If the evidence shows that such was the case, and further, that such note was secured by mortgage on real estate, the guardian would not be justified in voluntarily parting with such a security for Confederate money ; and if such Confederate money was afterwards lost by investment in Confederate bonds, or otherwise, the loss must fall upon the guardian, and not upon the estate of his ward."

The motion was overruled, and the plaintiff excepted.

WRIGHT & FEATHERSTON, for plaintiff in error.

DABNEY & FOUCHE for defendant.

BLECKLEY, Judge.

1. This was not an action which could reach the guardian for any failure to gather up the ward's assets. The breach of the bond alleged, had no such bearing. And the inventory of notes, and the returns of sale, were not offered avowedly, to impeach the guardian as a witness. Treating them as admissions made by him, they were made before he became guardian, and for that reason, if for no other, would not be binding on his sureties as admissions. As the sureties were defendants to the action, as well as the guardian, evidence which would affect him were he sole defendant, might, nevertheless, be inadmissible because it could not be received in the present suit with a restriction of its effect to him alone. We think the evidence was properly excluded.

2. Whether the special plea was good or bad, to strike it after the evidence was closed and the trial finally shaped, would be unsound practice. For the same reason, the evidence which was legally admitted to support it ought not to have been ruled out at that stage. A reversal of the judge's rulings on these questions would be an unwholsome precedent.

3. It has been ruled that a guardian may explain his returns by parol, and show the actual truth of his accounts. It may be that this is treating too lightly his solemn admissions, made on oath, approved and recorded; but such seems to be the latest adjudication on the subject. 45 *Ga.*, 520.

4. The guardian admitted in his evidence that he collected certain of the notes prior to the war. Of course he could not have collected them in Confederate money, and he failed to show when, or by what means, that part of the fund became commuted. This he was bound to do in

order to take credit for it as invested in bonds as Confederate money.   52 *Ga.*, 600

5. As we understand the evidence, the guardian, although he had an order from the judge sufficiently broad to cover the investment of any and all funds, did not use it except to invest Confederate funds.   Therefore, he can take no aid from the order as to any money collected before the war, without first disclosing how it legally changed form and became Confederate money.

6. The Ware note was not collected, but sold, and the purchaser used it to pay for land.   Had 'the guardian so used it, the land, and not Confederate money, would have stood in place of the note.   The guardian had no power to sell it without leave from the ordinary, and not then to sell privately, as he did.   Code, § 1828.   He cannot avoid liability for this note, upon the showing made in the evidence.

7. On mature consideration, we have deemed it proper to indicate in the syllabus the two propositions between which the court below will have to choose in reaching the consequences of the settlement made by the guardian, resulting in the discharge of himself from liability as administrator in respect to the notes, as a whole, and in commencing his liability as guardian. (See 5 Mason, 95 ; 18 How., 100.)   This act took place before the war, and is to be measured by a peace, and not by a war standard.   The case was prepared and tried as if the special plea, when made out in evidence, would be a defence.   That being so, unless we were free from all doubt, we should not like to rule the question finally until after the court below has dealt with it deliberately, upon a motion made in due time to strike the plea. The motion made before was out of season, and what effect that circumstance may have had on the decision of it, we do not know.   A new trial follows from the views presented by us in the 4th and 6th heads of this opinion.   This being so, the whole case is open to be re-tried.

Cited for plaintiff in error, 57 *Ga.*, 226 ; 11 Vesey, 377 ; 8 Gill and J., 218 ; 30 Penn., 536 ; 1 J   J. Marsh. 440 ; 55

*Ga.*, 89; 43 Ala., 109; 46 *Ib.*, 600; 25 *Ib.*, 363; 3 S. C., 457; Story on Agency, §§ 98, 215; 13 Pick., 206; 6 Bro. Parl. Cas., 280; 2 Wash., C. C., 378; Paley on Agency, by Loyd, 41, 42; Code, § 1823; 11 *Ga.*, 258; 33 *Ib.*, 33; 45 *Ib.*, 520; 42 Miss., 194; 35 *Ib.*, 540; 33 *Ib.*, 553; Perry on Trusts, §§ 438, 452; 48 *Ga.*, 471; 54 *Ib.*, 291; 3 S. C., 451. For defendants, 45 *Ga.*, 520; 37 *Ib.*, 205; 38 *Ib.*, 304; 39 *Ib.*, 96, 569; 46 *Ib.*, 361; 48 *Ib.*, 150; 56 *Ib.*, 411·

Judgment reversed.